UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA

vs.                                    DOCKET NO.: 0422 2:16cr00063-001

SUSAN M. SPEARMAN,
                        Defendant.

## POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS

**COMES NOW** the Defendant, Susan M. Spearman ("Ms. Spearman" or "Spearman"), by and through counsel, in accordance with *Rule 32* of the *Federal Rules of Criminal Procedure*, *Section 6A1.2* of the *Sentencing Guidelines and Policy Statements* (hereafter USSG) as well as this Court's sentencing *Order*, and hereby represents that she has reviewed the Probation Office's *Pre-Sentence Report* ("PSR").  Ms. Spearman has no objections to the report and states her position with respect to sentencing factors.

Ms. Spearman will argue herein that as reflected by the undisputed facts of this case, Ms. Spearman has fully cooperated with the United States since learning of her unwitting participation in a bankruptcy fraud masterminded and performed by her boyfriend/significant other/fiancé, Mr. Edward O. (Ted) Yoder.  Mr. Yoder is charged with bankruptcy fraud and is scheduled to stand trial for that charge on October 18, 2016.  Ms. Spearman urges the Court herein to agree that her

**Inman &
Strickler, P.L.C.**
――――――
**Attorneys at Law**
――――――

1

involvement in Mr. Yoder's criminal plan was that of a minor participant and award her that consideration available under the USSG.   As a minor participant who cooperated with the United States as soon as she was apprised of her criminal conduct and who has never been in trouble before in her life, Ms. Spearman respectfully asks that this Honorable Court impose a sentence that does not include an active period of incarceration.

### Preliminary Background

On May 10, 2016, Ms. Spearman pled guilty pursuant to a written plea agreement, to the sole count of the *Criminal Information* charging her with Bankruptcy Fraud in violation of *18 U.S.C. § 157(1).*   The PSR has been prepared and disclosed to the parties.   Neither party has any objections to the report or advisory guidelines.   The *Sentencing Hearing* in this matter is scheduled for September 16, 2016, at 10:00 a.m.

Ms. Spearman's current advisory guideline range is 18 to 24 months, according to the PSR.  PSR Page 12  Ms. Spearman respectfully asks this Court to impose a sentence of probation.   Ms. Spearman submits that such a sentence complies with the statutory mandate to impose a sentence that is sufficient, but not greater than necessary, to accomplish the goals of sentencing.   See *18 U.S.C. §3553(a).*  As is amply described in the PSR and herein, Ms. Spearman has never previously been charged with criminal activity and does not pose any threat to

2

commit any crime in the future.  Ms. Spearman's involvement in the instant offense is much more the result of her affection, love and commitment to Mr. Yoder than it is in any way an effort to defraud the Bankruptcy Trustee or in any way to enrich herself.

<u>General Sentencing Considerations</u>

Courts must take the United States Sentencing Guidelines "into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005).  The sentencing court should begin the sentencing process "by correctly calculating the applicable Guidelines range.*" United States v. Gall*, 553 U.S. 38, 49 (2007).  The sentencing court should next consider the specific offender characteristics and any grounds for departure as outlined in the Guidelines.  *U.S.S.G. § 1B1.1(b)*.  Finally, the sentencing court should consider the factors set forth in *18 U.S.C. § 3553(a)*, pursuant to which the Sentencing Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 553 U.S. 85, 90 (2007).

In addition, a district court, "may not presume that the Guideline range is reasonable," and instead "must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 597.  Moreover, the Supreme Court has specifically ruled that, in balancing the *Section 3553(a)* factors, a judge may determine that, "in the particular case, a within-guidelines sentence is 'greater than necessary' to serve

3

the objectives of sentencing." *Kimbrough*, 128 S. Ct. at 564. See *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) (a district court may consider arguments that "the Guidelines sentence fails to properly reflect *Section 3553(a)* considerations, or [that] the case warrants a different sentence regardless.")

Other statutes also give the district court discretion in sentencing. Under *18 U.S.C. 3582*, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on *Section 3553(a)* factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation. In sum, in every case, **a sentencing court must consider all of the *Section 3553(a)* factors - and not just the guidelines - in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.**

### *Section 3553* Factors

As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). With the *United States Sentencing Guidelines* now rendered "advisory only," *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007), a district court has substantial discretion in fashioning a sentence

4

appropriate to the individual circumstances of the defendant and the unique facts of the offense.  While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration."  *Gall v. United States*, 128 S. Ct. 586, 597 (2007).   See *Kimbrough*, 128 S. Ct. at 564 ("the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

As mandated by Congress, the fundamental principle of sentencing is that a court "**shall impose a sentence sufficient, but not greater than necessary**" to meet specified sentencing goals, including the goal of just punishment.   (Emphasis Added)  *18 U.S.C. Section 3553.*  In determining the minimally sufficient sentence, *Section 3553* directs sentencing courts to consider the following factors with respect to Ms. Spearman:

(1)     the nature and circumstances of the offense and the history and characteristics of Ms. Spearman;

(2)     the need for the sentence imposed

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of Ms. Spearman; and

(D)     to provide Ms. Spearman with needed educational or vocational

5

> training, medical care, or other
> correctional treatment in the most
> effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentences and the sentencing range established for
        bankruptcy  fraud;

(5)     any pertinent policy issued by the Sentencing Commission;

(6)     the need to avoid unwarranted sentence disparities among defendants
        with similar records who have been found guilty of similar conduct;
        and

(7)     the need to provide restitution to any victims of the offense.

*18 U.S.C. Section 3553.*

In addition, a district court "may not presume that the Guidelines range is reasonable," and instead "must make an individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. Moreover, the Supreme Court has specifically ruled that, in balancing the *Section 3553(a)* factors, a judge may determine that, "in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 128 S. Ct. at 564. See *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) (a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect *Section 3553(a)* considerations, or [that] the case warrants a different sentence regardless.")

### The Appropriate Sentence In This Case

The overriding principle and basic mandate of *§ 3553(a)* requires district

courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in *Section 3553(a)(2)*.  The "sufficient, but not greater than necessary" requirement is not just another factor to be considered along with the others set forth in *Section 3553(a)* - **it sets an independent limit on the sentence**.

Accordingly, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing.  The Court is to consider (a) the nature and circumstances of the offense and the history and characteristics of Ms. Spearman; (b) the kinds of sentences available; (c) the guideline range; (d) the need to avoid unwarranted sentencing disparities; and (e) the need for restitution, when applicable.  The Court must "tak[e] into account the real conduct and circumstances involved in sentencing," *Gall v. United States*, 552 U.S. 38, 54 (2007), as well as the defendant's personal history and characteristics, *18 U.S.C. § 3553(a)(1)*.  Taken alone, the guidelines cannot do this.  Therefore, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  Id. at 52.

As is described fully *infra*, Ms. Spearman committed the bankruptcy fraud without any knowing criminal intent, following the directions of the fraud's mastermind and beneficiary, her boyfriend/fiancée Mr. Ted Yoder.  Because of this

lack of knowing criminal intent and because Ms. Spearman had a spotless record before this situation and because Ms. Spearman never acted to enrich herself from the fraud Mr. Yoder orchestrated using Ms. Spearman, Ms. Spearman respectfully urges the Court that a period of probation is the sentence that will impose the least amount of punishment necessary to accomplish the purposes of sentencing.  Ms. Spearman has learned a lesson that she will never forget and never repeat.  That is certain.

### Evidence at the Sentencing Hearing

1.     Testimony:  It is contemplated the defendant will testify on her behalf on matters set forth in detail in the position statement.

2.     Documents:  Letters will be presented from parties who know the defendant on her character and motivation.

### Nature and Circumstances of the Offense

The offense in the instant matter is bankruptcy fraud.  The *Statement of Facts*, set out in the "Offense Conduct" section of the PSR, details the basic facts and circumstances of the offense.   At that basic level, the PSR's account that Ms. Spearman participated in Mr. Yoder's plan to defraud the Bankruptcy Trustee is accurate . . . *as far as it goes*.  As the PSR states, Ms. Spearman has acknowledged that she received funds from Mr. Yoder and that, after Mr. Yoder had filed a Chapter 7 bankruptcy, Ms. Spearman allowed the funds she had received from Mr. Yoder to

be used to pay some of Mr. Yoder's obligations for alimony, his children's tuition, personal bills incurred by Mr. Yoder, etc.   HOWEVER, Ms. Spearman never realized, to her eternal regret and shame, that Mr. Yoder was using Ms. Spearman to commit a fraud upon anyone.

Trite though it may sound, Ms. Spearman acted out of love and devotion to the man she thought she was going to marry and whom she knew, during some of the relevant time, to be both terminally ill with prostate cancer and suicidal.   Ms. Spearman never realized that Mr. Yoder was intent upon hiding funds from the Bankruptcy Trustee by using her as a vessel within which to secret Yoder's monies. As the United States agrees, **as soon as Ms. Spearman was told the reality of the situation, she turned over all of her financial records to the Bankruptcy Trustee and has cooperated in all investigations thereafter.**   Ms. Spearman accepted $350,000.00 from Mr. Yoder that Mr. Yoder told her he intended to use to pay off a debt that he had fraudulently incurred on his parents' behalf.   Ms. Spearman then distributed most of that sum in paying personal bills of Mr. Yoder while Mr. Yoder was in a Chapter 7 bankruptcy.   While Ms. Spearman knew that she was paying Mr. Yoder's bills with the money he had given her, she did not realize that those actions were illegal at that time.   Upon being informed that they were because of bankruptcy law and Mr. Yoder's Chapter 7 bankruptcy, Ms. Spearman immediately turned over all records she had to the Bankruptcy Trustee and has cooperated with the United

States in all matters thereafter, including pleading guilty to the felony for which she is to be sentenced by this Honorable Court with the understanding she may be required to testify and otherwise cooperate to assist in the prosecution of Mr. Yoder. Ms. Spearman timely admitted her guilt before this Court on May 10, 2016, and further expressed her remorse when interviewed for her PSR.

### History and Characteristics of Ms. Spearman

Part C of the PSR, entitled "Offender Characteristics," provides substantial detail regarding Ms. Spearman's upbringing and related social history, set forth in paragraphs 37 through 59.  The following information describes the details of how and why Ms. Spearman, someone who has no criminal history at all, through her romantic devotion to Mr. Ted Yoder, became the unwitting, unknowing vessel for Mr. Yoder's criminal bankruptcy fraud and, thus, a defendant who appears before this Honorable Court for sentencing for a felony.

The romantic relationship between Ms. Spearman and Mr. Yoder began in 2007 and did not fully end until 2015, shortly after Ms. Spearman was fully apprised by her own counsel that what Mr. Yoder had done placed Ms. Spearman in the position of having to plead guilty to having committed a felony and face a likely punishment that could include incarceration.  Certainly, Ms. Spearman will not be the first, and certainly not the last, woman who appears before the Court who relied upon and trusted her romantic partner and then found out that her trust resulted in

nothing but the ashes of a criminal conviction.  In this case, however, it is important to note that there was a much greater degree of sophistication on the part of Mr. Yoder, an extremely well known mortgage banker in the City of Virginia Beach and the Tidewater area than compared with Ms. Spearman, who has a very limited knowledge of financial matters and has never been exposed to anything regarding bankruptcy.

During the time of the relationship between Ms. Spearman and Mr. Yoder, Mr. Yoder was estranged from his wife, the mother of two daughters, and going through a lengthy divorce.  Mr. Yoder, along with his parents, had invested in a property in Pungo.  Mr. Yoder had made initial investments in the property with his parents but had represented to them that his investment in the property, in the amount of $275,000.00, had been paid off.  This was not an unexpected occurrence as Mr. Yoder for a number of years was making close to a million dollars a year in salary and other compensation at Monarch Bank.  Unbeknownst to his parents, however, Mr. Yoder, given his position with Monarch Mortgage, had paid off the original deed of trust and then increased it, eventually, to an amount of $350,000.00, and used it as collateral on the property.  Mr. Yoder accomplished these actions by misrepresenting in documentation that he was the manager of the family LLC, which owned the property, Sunnydell, LLC., and had the authority to sign all documentation to place a lien on the property without signatures of the other owners

- Mr. Yoder's parents - of the LLC.  This was another fraud committed by Mr. Yoder.

In early 2012, Mr. Yoder was diagnosed with prostate cancer.  The diagnosis at that time was terminal.  Mr. Yoder's initial reaction was total denial.  Thus, while living with Ms. Spearman, Mr. Yoder initially refused the necessary treatment and rejected any possibility of removal of his prostate.  Mr. Yoder kept saying that he just wanted to die.  This was extremely traumatic for Ms. Spearman.  As Mr. Yoder's "fiancée," and being in love with Mr. Yoder, Ms. Spearman wanted him to live and wanted him to be well.  Thus, Ms. Spearman did everything she could to try to help him deal with the terminal diagnosis of his cancer and his reaction - several suicide attempts - to it.  At the same time, Mr. Yoder was undergoing more financial distress because of an indebtedness he had endorsed for parties in a project that went south and for which Mr. Yoder ended up owing the Bank of Hampton Roads significant amounts of money that eventually forced him to file his first bankruptcy, a Chapter 11 proceeding.

Mr. Yoder's reaction to the reverses in his life - financial and physical - was to make several attempts to take his life.  Each time, Ms. Spearman was there for him and nursed him back to health, sacrificing time, energy and emotion to help Mr. Yoder stay alive.  At last, after much effort, Ms. Spearman convinced Mr. Yoder to go with her to see a prostate specialist in New York.  It was this consultation that

convinced Mr. Yoder to have his prostate removed and, ultimately, saved Mr. Yoder's life.   Ms. Spearman, again, stood by him, nursed him and helped him survive.   Never once did Ms. Spearman ask for anything in return from Mr. Yoder.

At this point, the cancer had progressed dramatically and he had a poor prognosis.   He again attempted suicide, all of this occurring between the late summer of 2012 and October 2012.   At this point, his Chapter 11 bankruptcy proceeding had been dismissed and no other bankruptcy proceeding was pending.   His Chapter 7 proceeding would not be filed until December 2012.

In the interim, given the concerns that Mr. Yoder had for his health and the fact that he might well die, he wanted to be sure that funds were available that would not go to his estranged wife but would be utilized to pay off the debt that he had fraudulently placed on the family farm so his parents would not have to face the issue that he had created unbeknownst to them.   For these reasons, Mr. Yoder told Ms. Spearman, Mr. Yoder cashed in his Sirius stock and transferred the proceeds therefrom to a Monarch Bank account Spearman maintained in her sole name.   At the time of the transfer, there was nothing illegal about the transfer to Spearman and, had Mr. Yoder not gone bankrupt or had these funds been utilized to pay off the debt Mr. Yoder told Ms. Spearman he intended to pay off, bankruptcy fraud by Ms. Spearman would not have occurred.   As events unfolded, Mr. Yoder's health improved, his prognosis was upgraded from terminal and, therefore, the proceeds

from the Sirius stock were not used to pay off the debt as Mr. Yoder had told Ms. Spearman he would.  Mr. Yoder's parents are currently disputing the validity of that debt as Mr. Yoder had obtained it by fraud.

Mr. Yoder lost his job with Monarch Mortgage due to his financial difficulties and could not secure other employment due to a binding covenant not to compete.  Mr. Yoder assured Spearman whenever she raised the issue about the Sirius funds that he had transferred to her that she did not have to be concerned about anything and that there was no problem with what had occurred.  Ms. Spearman's concerns were with the amount of the monies she had received; Ms. Spearman never thought that Mr. Yoder's bankruptcy proceedings in some way affected the funds he had entrusted to her for his use.  Ms. Spearman absolutely understands *now* that this was both naive and foolish on her part.

After Mr. Yoder filed bankruptcy in December 2012, the funds, which Ms. Spearman had transferred to an investment account with Bank of New York Mellon, an existing investment account which she had with a relatively small sum in it of her own funds, Ms. Spearman did, as pointed out by the stipulated facts before the Court, disburse to Mr. Yoder or for his benefit, the money that she had received from Mr. Yoder.  These funds were not paid to her or on her behalf but solely for the benefit of Mr. Yoder and *his* obligations, including alimony, Norfolk Academy tuition for Mr. Yoder's children, credit card payments that Mr. Yoder had incurred,

reimbursement of charges made by Spearman for Mr. Yoder's benefit on her credit card, etc.

In the meantime, the Bankruptcy Trustee in Mr. Yoder's Chapter 7 bankruptcy case retained Mr. John McLemore to represent the Bankruptcy Trustee. Mr. McLemore became aware by review of the Yoder 2011 Chapter 11 bankruptcy and the schedules filed therein that assets were missing between the 2011 schedules and the Yoder schedules filed by different counsel in 2012 in Mr. Yoder's Chapter 7 bankruptcy. Depositions were taken of Mr. Yoder, in which Mr. Yoder was evasive and never disclosed what had occurred with his Sirius stock, indicating that he had had a series of mini strokes and had memory lapses. Ms. Spearman was not part of these depositions but was aware of the existence of Mr. Yoder's ongoing bankruptcy while at the same time never being privy to the legal implications of Mr. Yoder's Chapter 7 proceedings.

Mr. McLemore, on behalf of the Chapter 7 Bankruptcy Trustee, determined that Mr. Yoder had committed fraud and confronted Mr. Yoder's bankruptcy counsel with the issue. As a result, Mr. Yoder's attorney, Greg Pugh, asked Mr. Yoder to explain what had occurred with regard to the Sirius stock. Ms. Spearman came to that meeting and was apprised *for the very first time* that there was a question of the legality of the transfer of the Sirius stock. **Ms. Spearman was appalled to discover that her actions were a problem; she had never committed an illegal act in her**

**life and knew nothing about how bankruptcies worked**.  Mr. Yoder's attorney made clear to Ms. Spearman that the transfers to Mr. Yoder were wrong in the eyes of the law and were going to pose a problem for Ms. Spearman.

Ms. Spearman immediately cooperated with the U.S. Trustee.  Ms. Spearman provided to Mr. McLemore all of her bank account records.  In addition, based on what she had been told by Mr. Yoder's attorney that she should not have the funds Mr. Yoder had transferred to her, Ms. Spearman delivered to Mr. Yoder the balance of the funds, approximately $39,000.00.  At that time, Ms. Spearman was led to believe by Mr. Yoder that he was going to take those funds and deliver them to the Bankruptcy Trustee.  Mr. Yoder apparently made some effort to do so but changed his mind.  In any event, Ms. Spearman never utilized the remaining $39,000.00 and received no financial benefit from any of the funds that she had been given to hold and then disburse later for Mr. Yoder and his benefit and direction.

Clearly, as Ms. Spearman has acknowledged, the disbursement of the Sirius stock proceeds to Mr. Yoder was wrong at this point.  Ms. Spearman acknowledges, much to her chagrin, that ignorance of the law is no excuse.  All that Ms. Spearman can proffer as an explanation is that had her judgment not been clouded, based upon her romantic relationship with Mr. Yoder, his medical issues and suicide attempts, she probably would have more clearly recognized that once he had filed bankruptcy in December 2012 and asked her to make disbursements of funds that he had given

16

her prior to the bankruptcy for his benefit this could not have possibly been correct and was unlawful.

Accordingly, **Ms. Spearman has and does accept full responsibility for her actions**.  At the same time, Ms. Spearman asks the Court to recognize these additional facts and the fact that she did not benefit financially from the funds that she held and then paid on Mr. Yoder's behalf.  Ms. Spearman asks that the Court not forget that, as set forth in the PSR, Paragraph 13, she has already been subject to a civil suit from the Bankruptcy Trustee as a transferee without value and the Yoder Bankruptcy Trustee has recovered a judgment against Ms. Spearman for the $350,000.00.  As the PSR notes, Ms. Spearman is without the financial ability to pay that sum or, realistically, to earn sufficient monies to pay it in her lifetime.  SEE PSR, Paragraph 59.

Simply put, as with so many defendants that appear before the Court, Ms. Spearman's life has been ruined.  Ms. Spearman's situation is different, however, in that while Ms. Spearman wittingly accepted and disbursed the Sirius stock proceeds, she did not knowingly participate or abet Mr. Yoder in the crime that he was committing, nor did Ms. Spearman benefit in any way from the bankruptcy fraud that was conceived, executed and enjoyed by Mr. Yoder.  Ms. Spearman was Mr. Yoder's dupe that he has abandoned to her unfortunate fate.

As noted earlier and in the PSR, Ms. Spearman has never been in trouble

before.  The stigma of this experience shames her more than any but law abiding citizens can understand.  The felony conviction and the concomitant loss of rights it means will burn her like the red letter of Hester Prynne.  In addition, it must be remembered that Ms. Spearman, being a law abiding citizen, immediately chose to aid the government in its criminal investigation of Mr. Yoder.  She cooperated immediately with the Bankruptcy Trustee's counsel, Mr. McLemore, and made available her accounts records to show what had occurred immediately and without the necessity of any kind of process or action against her.  All of the financial records that she provided were provided within days of the time that she was told that this was a legal problem.

**Consideration-Reduction for Role in the Offense USSG 3B1.2**

Ms. Spearman was simply a conduit that Mr. Yoder used.  She had no knowledge of Mr. Yoder's criminal intentions.  As reflected by the PSR and the facts set out *supra*, Mr. Yoder is the person who was the mastermind and the person with the greatest knowledge of the consequences of his acts.  Mr. Yoder filed his first bankruptcy in 2011.  It was a Chapter 11 proceeding but it contained the same schedules with regard to listing of assets, along with statements of financial affairs. Certainly Mr. Yoder knew his responsibilities to honestly and accurately state his assets and any transfers and had previously had to attend bankruptcy court hearings where he had to testify under oath before a bankruptcy trustee or someone

18

empowered by the Office of the U.S. Trustee. There is no evidence that Ms. Spearman knew these things; it was not her bankruptcy. It was Mr. Yoder who took the steps to liquidate his Sirius stock and convert it into cash. It was Mr. Yoder who then transferred the funds to Ms. Spearman. That, in and of itself, was not any offense. It is what followed that is the true gravamen of the instant offense, again, all directed and manipulated by Mr. Yoder through the obedient, unthinking, marionette-like actions of Ms. Spearman.

First, Mr. Yoder, not Ms. Spearman, chose to file another bankruptcy proceeding, this one a Chapter 7. Mr. Yoder willfully filed a false statement of financial affairs with the Bankruptcy Court. Had Mr. Yoder filed a true statement of financial affairs, which would have disclosed the transfer of the Sirius stock proceeds to Ms. Spearman, the Bankruptcy Trustee would have been on notice and could have taken steps to retrieve those funds. Mr. Yoder then compounded this crime by under oath failing to disclose other of his assets in his initial bankruptcy filing, leaving off substantial items of personal property. Mr. Yoder then appeared before Carolyn Camardo, the designated Bankruptcy Trustee for his case, and, under oath, lied in response to the questions that she asked him. Mr. Yoder did this on more than one occasion as there was a continued *341 Hearing*.

As pointed out above, Mr. McLemore, hired by Carolyn Camardo to assist her as attorney for the Trustee in Mr. Yoder's Chapter 7 proceeding, investigated the

case and after review of his previous bankruptcy filings in 2011, was able to determine that certain assets had not been disclosed. He then took Mr. Yoder's deposition and the transcript of that deposition reflects that Mr. Yoder was evasive and refused to answer what had happened to his Sirius stock previously shown on his 2011 bankruptcy proceeding.  He was also evasive as to other issues.  Finally, Mr. McLemore was able to ascertain what had occurred and so advised Gregory Pugh, Mr. Yoder's attorney.

It was at this point that Ms. Spearman discovered that what she had been doing was wrong and improper and she immediately provided her bank account records in short order to Mr. McLemore, the attorney for the Trustee.  The remaining funds in the investment account she returned to Mr. Yoder with the understanding that he was going to return those to the trustee, that had Mr. Pugh told her to write the check to the bankruptcy trustee, she would have done so as she was appalled and understood that she could face serious consequences for what had occurred.

### §3B1.2. Mitigating Role

Under the sentencing guidelines there are a series of considerations to be determined and factors set forth under the commentary §C Fact-Based Determination,

> (i)      refers to "the degree which the defendant understood the scope
>
> and structure of the criminal activity."  Clearly, Ms. Spearman did not
>
> understand initially that she was helping Mr. Yoder commit a fraud on

the bankruptcy court. Ms. Spearman never understood this until Mr. Yoder's counsel told her that what she had done was wrong.

(ii)     "the degree to which the defendant participated in planning or organizing the criminal activity." There is no question that Mr. Yoder's scheme could not have been accomplished without a willing participant to hold the funds and pay them back to him and pay for his benefit. But Ms. Spearman did not participate in the planning or organizing of the criminal activity. The entire scheme sprang solely from Mr. Yoder's head and expertise. Mr. Yoder is being prosecuted for the same.

(iii)     "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority." Ms. Spearman was in a romantic relationship with Mr. Yoder, a man who, during a large part of the time, was fighting a terminal medical diagnosis by trying to commit suicide. In those circumstances, Ms. Spearman admits, her judgment was obviously clouded. She had been in a somewhat subservient relationship with Mr. Yoder in any event, given the fact that he was a rich, successful and respected mortgage banker and, while Ms. Spearman is certainly intelligent, she has no expertise in the financial world other than maintaining her own small

21

business.   It was Mr. Yoder who made the decision to lie on his bankruptcy petition.   It was Mr. Yoder who made the decision to lie every time he was questioned.   **No one has suggested that Ms. Spearman lied about anything** or that she was ever privy to Mr. Yoder's malignant machinations.

(iv)   "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"   As been described *supra*, it is clear that without Ms. Spearman's assistance, the bankruptcy fraud she has pled guilty to could not have happened without her involvement (it is entirely likely, however, that Mr. Yoder would found another, possibly more "expensive" tool).   However, Ms. Spearman acted and was directed at all relevant times by her boyfriend, Mr. Yoder.

(v)   "the degree to which the defendant stood to benefit from the criminal activity."   This is one of the glaring areas of difference between this defendant and almost all others that appear before the Court to be sentenced.   This defendant, Ms. Spearman, did not benefit in any substantive, financial way.   Even though there were hundreds of thousands of dollars under her control by virtue of them being in her

investment account, Ms. Spearman always directed the payments from that account solely at the direction and for the benefit of Mr. Yoder and not for herself.  Had she used these funds for her own personal benefit, we would be in an entirely different situation.

With all this in mind, we would ask that consideration be given to decrease the offense level under this rule and adjust her guidelines accordingly.

### The Need for the Sentence Imposed to Reflect the Seriousness of the Offense Promote Respect for the Law, to Provide Just Punishment and to Afford Adequate Deterrence to Criminal Conduct

There is no doubt that the crime of bankruptcy fraud is a serious one and that punishment therefore is a necessary component in the enforcement of federal law. However, Ms. Spearman presents an almost entirely unique bankruptcy fraud defendant.  She is not someone who was complicity in the criminality of the fraud committed.  Mr. Yoder manipulated her and she did as he bade her to.  Ms. Spearman received nothing from the monies Mr. Yoder hid through her.  Mr. Yoder received all the financial benefits of the fraud committed by Ms. Spearman.  Defense counsel does not believe that the United States will disagree with this view.

Because Ms. Spearman has no prior record of ever committing a crime and there is absolutely no indicia that she would have committed any crime had she known that was what she was doing when she followed her boyfriend/fiancée's instructions as to what to do with what she understood was his money, there is little

likelihood that any sentence of more than probation in this case would promote respect for the law. Ms. Spearman has that respect, both before the fraud and certainly more so after. Any observer who reviews this case would see it for what it is: a terrible life lesson for a lady who had never been in trouble before and did not intend to commit any crime. Accordingly, a sentence of probation would be more than enough to promote respect for the law with this particular defendant.

### Providing Just Punishment

A sentence of probation in this case would reflect the seriousness of the offense, promote respect for the law and provide just punishment to Ms. Spearman. While the preceding sentence appears incongruous at first, defense counsel is certain that the Court will agree, upon reviewing everything from the PSR, the testimony of Ms. Spearman, letters of support presented at the upcoming hearing and the position of the United States, that there is no need for deterrence or further punishment via incarceration for this particular defendant.

With this conviction, Ms. Spearman is now a convicted felon. She is mature enough to appreciate the negative stigma that is now attached to her because of her ill-advised decisions she made from admirable emotions but all too unfortunate naiveté.

### Providing Needed Educational/Vocational Training/Medical Care/ Correctional Treatment

As set forth above, Ms. Spearman has an education and, until this charge, has

never been in trouble in her life. All of Ms. Spearman's needs, if any are perceived by the Court, may be satisfied through non-custodial efforts.

**Kinds of Sentences Available/Sentencing Range and Guideline Policies**

The statutory range of punishment is probation to 5 years imprisonment with a maximum term of supervised release of 1 to 5 years. The advisory guideline range is a term of imprisonment of 18 to 24 months (offense level 15, criminal history category I; PSR Page 12). This range is in Zone A, which provides that a sentence of probation is authorized, and while not required, community confinement, intermittent confinement, or home detention for imprisonment may be imposed. *U.S.S.G. §5B1.1.* With a sentence of probation of 5 years, Ms. Spearman will be able to maintain her business and strive to work towards paying any restitution ordered by this Honorable Court despite the embarrassing , horrifying experience that this guilty plea has confronted her with.

**Restitution**

Restitution is not recommended by the PSR. PSR Page 12. As noted earlier, a judgement in the amount of $350,000.00 has been obtained by the Bankruptcy Trustee against Ms. Spearman.

**CONCLUSION**

For the reasons advanced above, Ms. Spearman respectfully moves for a sentence of probation. Such a sentence is sufficient, but not greater than necessary,

25

to comply with the factors set forth in *18 U.S.C. § 3553(a)*.   Ms. Spearman respectfully suggests to the Court that her situation almost unique for a criminal defendant awaiting sentencing by the Court and exactly the sort of sentencing event that the cited language of crafting a "sentence that fits the crime" had in mind.   Yes, Ms. Spearman committed bankruptcy fraud, but not as the criminal who planned or in any way intended to benefit from the fraud.   The facts are that Ms. Spearman did not benefit from the fraud, did not understand that she was committing fraud and fully cooperated with the authorities as soon as she realized the trap Mr. Yoder had allowed her to walk into.   Further, Ms. Spearman has never been in trouble before and there is nothing in her life that suggests that she will ever be in trouble again.

Given the unique, undisputed facts regarding this defendant and the crime she has pled to, this Honorable Court should find that she was a minor participant as the term is defined by the USSG and sentence her to probation as it is empowered to do.

Respectfully submitted,

SUSAN M. SPEARMAN
By counsel

/s/ Barry Randolph Koch
Barry Randolph Koch, Esquire
VA State Bar No: 16609
INMAN & STRICKLER, P.L.C.
575 Lynnhaven Parkway, Ste. 200
Virginia Beach, Virginia 23452
(757) 486-7055
(757) 431-0410 Facsimile
bkoch@inmanstrickler.com

26

<u>CERTIFICATE OF SERVICE</u>:

I hereby certify that on the 9th day of September, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Stephen W. Haynie, Esquire
Assistant United States Attorney
U.S. Department of Justice
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510-1671

<u>/s/ Barry Randolph Koch, Esquire</u>
Barry Randolph Koch, Esquire
VA State Bar No: 16609
INMAN & STRICKLER, P.L.C.
575 Lynnhaven Parkway, Ste. 200
Virginia Beach, Virginia 23452
(757) 486-7055
(757) 431-0410 Facsimile
bkoch@inmanstrickler.com

I hereby certify that on the 9th day of September, 2016, I caused a true and correct copy of the foregoing to be mailed and/or emailed to the following non-filing user:

Carmen I. Perez
United States Probation Officer
600 Granby Street, Ste. 200
Norfolk, VA 23510
Carmen_I_Perez@vaep.uscourts.gov

<u>/s/ Barry Randolph Koch, Esquire</u>
Barry Randolph Koch, Esquire

VA State Bar No: 16609
INMAN & STRICKLER, P.L.C.
575 Lynnhaven Parkway, Ste. 200
Virginia Beach, Virginia 23452
(757) 486-7055
(757) 431-0410 Facsimile
bkoch@inmanstrickler.com